IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **GORDON POTTS AND BRANDY WEST,** § | | |
| § | | |
| Plaintiffs, § | | |
| v. § | CIVIL ACTION NO. 3:12-CV-1596-O | |
| § | | |
| **CHESAPEAKE EXPLORATION, L.L.C.,** § | | |
| § | | |
| § | | |
| **Defendant.** § | | |

## MEMORANDUM OPINION AND ORDER

Before the Court are:

1. Plaintiffs' Motion for Partial Summary Judgment (ECF No. 17), filed September 26, 2012 ("Pl. Mot.");

2. Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment (ECF No. 18), filed October 17, 2012;

3. Defendant's Brief in Support of its Response to Plaintiffs' Motion for Partial Summary Judgment (ECF No. 19), filed October 17, 2012 ("Def. Brief in Resp.");

4. Defendant's Appendix in Support of Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment (ECF No. 20), filed October 17, 2012;

5. Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment (ECF No. 23), filed October 31, 2012 ("Pl. Reply");

6. Defendant's Motion for Summary Judgment (ECF No. 24), filed December 31, 2012;

7. Defendant's Brief in Support of Motion for Summary Judgment (ECF No. 25), filed

1

December 31, 2012 ("Def. Brief in Supp.");

8. Defendant's Appendix in Support of its Motion for Summary Judgment (ECF No. 26), filed December 31, 2012 ("Def. App.");

9. Plaintiffs' Response to Defendant's Motion for Summary Judgment (ECF No. 27), filed January 18, 2012 ("Pl. Resp.");

10. Defendant's Reply in Support of its Motion for Summary Judgment (ECF No. 28), filed February 1, 2013 ("Def. Reply.");

11. Plaintiffs' Letter Brief (ECF No. 34), filed March 6, 2013; and

12. Defendant's Response to Plaintiffs' Letter Brief (ECF No. 35), filed March 8, 2013.

In addition, on March 1, 2013, the parties presented oral arguments in support of their respective positions. *See* Tr. Summ. J. Hr'g, Mar. 1, 2013. Having reviewed the pleadings, evidence, and the applicable law, the Court finds that Defendant's motion for summary judgment should be and is hereby **GRANTED** in part. The Court further finds that Plaintiffs' motion for partial summary judgment should be and is hereby **DENIED**.

## I. BACKGROUND

The crux of this dispute involves the interpretation of the royalty clause in an oil, gas, and mineral lease, dated April 19, 2005 (the "Lease"), to which Plaintiffs Gordon Potts and Brandy West are lessors and Defendant Chesapeake Exploration, L.L.C. ("Chesapeake") is the lessee.[1] Pl. Mot. 2. The Lease covers two separate natural gas units known as the Texans Unit and the Allison Unit. *Id.* at 3. Plaintiffs allege Defendant breached the Lease's royalty clause by improperly deducting costs and expenses from their royalty payments and by failing to abide by

---

[1] Chesapeake acquired the Lease from FSOC Gas Co., Ltd. Pl. Mot. 2; Def. Brief 7.

the favored nations terms of the Lease. *Id.* at 1.  Paragraph 11 of the Lease contains the royalty clause and provides, in pertinent part, as follows:

> The royalties to be paid by Lessee are . . . (b) on gas, including casing head gas or other gaseous substances produced from said land or sold or used off the premises or for the extraction of gasoline or other products there from, the market value at the point of sale of 1/4 of the gas so sold or used.  However, in no event shall the royalty paid to Lessor be less than the Lessor's royalty share of the actual amount realized by the Lessee from the sale of oil and/or gas.  Notwithstanding anything to the contrary herein contained, all royalty paid to Lessor shall be free of all costs and expenses related to the exploration, production and marketing of oil and gas production from the lease including, but not limited to, costs of compression, dehydration, treatment and transportation.

Paragraph 29 of the Lease is the favored nation clause and reads, in pertinent part, as follows:

> [Defendant] agrees if [Defendant] or any of its Working Interest Partners has agreed to pay or later agrees to pay a higher royalty or bonus consideration to another landowner, mineral owner or other parties (in the same drilling unit, spacing unit or pooled or unitized land to which the leased lands are included), then [Defendant] shall pay to Lessor an amount based on such higher royalty, or bonus consideration retroactive to the effective date of the Lease(s). [Defendant] shall make available to Lessor, at reasonable times, for inspection and duplication at [Defendant's] expense, the files, books and accounts in its possession pertaining to the drilling unit, spacing unit or pooled or unitized lands, so Lessor may verify compliance with this provision.

The facts relating to this action are undisputed.  In 2011, Plaintiff Potts wrote Defendant and complained that Defendant was improperly deducting costs and expenses from his royalty payment. Pl. Mot. App. 11-12.  He wrote that the royalty clause contained a no-deduct provision, which meant his royalty payment was to be free and clear of all post-production costs and expenses.  *Id.*  After receiving Plaintiff Potts's letter, Defendant agreed that costs and expenses should not be deducted from his royalty payments and paid him $141,607.37 in additional funds to reimburse him for the improper deductions.  Pl. Mot. App. 13-16.  Plaintiff Potts then wrote

3

Defendant and complained that Defendant had not complied with the Lease's favored nation clause. Pl. Mot. App. 15-16. He asserted Defendant owed him additional bonus money because Defendant made more favorable payments to others pursuant to another pertinent lease. *Id.* Defendant again agreed and determined it owed Plaintiff Potts an additional $255,724.00 in bonus money. Pl. Mot. App. 17-19. However, Defendant reversed its previous conclusion that Plaintiff Potts's royalty payments were not subject to post-production deductions. *Id.* Defendant asserted the proper reading of the royalty clause and Texas law permitted it to take into account post-production expenses when calculating royalty payments. *Id.* Defendant therefore offset the additional bonus payments it owed Plaintiff Potts pursuant to the favored nations clause with what it concluded were erroneous over payments of royalties. *Id.* Defendant took a similar position with Plaintiff West.

Plaintiffs initiated this suit and contend that Defendant breached the Lease because the express provisions of the no-deduct clause prohibit Defendant from deducting any post-production costs or expenses from their royalty payments. Since Defendant has used post-production costs to calculate their royalty payments, Plaintiffs seek a declaration that this is improper and a judgment for the difference.

Defendant argues that it has complied with its obligations under the royalty clause. It provides that Chesapeake Operating, Inc. ("COI") operates the Lease for Defendant and COI sells the gas it produces from the Lease to its affiliate, Chesapeake Energy, Inc. ("CEMI"), at the well. Def. Brief in Resp. 8-9; Pl. Reply 5. Because the Lease provides that the royalty payment will be made on the value of gas as determined at the point of sale, Defendant calculates royalties on the value of the gas where COI sells it to CEMI. Def. Brief in Resp. 10. Defendant argues that it

deducts no expenses attributable to Plaintiffs' royalty payments from the time the gas is produced at the well until this first sale. *Id.* at 9. But to arrive at the value of the gas at this point, Defendant takes the value of the downstream market-based sale, then subtracts the costs and expenses incurred between the point of the sale to CEMI and the downstream resale point. *Id.* Defendant argues this is an approved method to determine market value at the point of sale and therefore it did not breach the Lease. *Id.* at 17.

Both sides move for partial summary judgment on the grounds that their interpretation is correct and that they are entitled to a declaration in their favor. The issues are now ripe for disposition.

## II.  LEGAL STANDARD

### A.    Summary Judgment Standards

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The pleadings, depositions, admissions, and affidavits, if any, must demonstrate that no genuine issue of material fact exists. Fed. R. Civ. P. 56(c).

Once the movant makes this showing, the non-movant must then direct the court's

attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.  *Celotex*, 477 U.S. at 323-24.  To carry this burden, the "opponent must do more than simply show . . . some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the non-movant must show that the evidence is sufficient to support a resolution of the factual issue in his favor. *Anderson*, 477 U.S. at 249.

While all of the evidence must be viewed in a light most favorable to the motion's opponent, *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). "[T]he party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim." *Id*.  (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).  Summary judgment in favor of the movant is proper if, after adequate time for discovery, the motion's opponent fails to establish the existence of an element essential to his case and as to which he will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23.

      B.      **Rules of Interpretation Applied to Contracts**

Both Plaintiffs and Defendant agree that the provisions in the Lease are unambiguous.  It is well-settled law that the interpretation of an unambiguous contract is a question of law for the court to decide.  *Guidry v. Halliburton Geophysical Servs. Inc.*, 976 F.2d 938, 940 (5th Cir. 1992).  An oil, gas, and mineral lease is a contract that is construed based on the rules of

6

interpretation applicable to contracts. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005). A district court sitting in diversity will look at state law to provide the applicable rules of contract interpretation. *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 443 (5th Cir. 1994). In this case, Texas law applies. *See id.*

Under Texas law, a contract is not ambiguous when, based on the plain language, the court can give it a certain or definite legal meaning or interpretation. *Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 746 (Tex. 2003); *R & P Enters. v. LaGuarta, Gavrel & Kirk*, 596 S.W.2d 517, 519 (Tex. 1980). When a contract is unambiguous, the court will not consider extrinsic evidence that creates an ambiguity or varies the meaning of the plain language. *Lewis v. E. Tex. Fin. Co.*, 146 S.W.2d 977, 980 (Tex. 1941). Further, a contract is not ambiguous simply because the parties advance different interpretations. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). Here, none of the parties allege that the provisions in the Lease are ambiguous, and the Court agrees. Therefore, the Court's analysis is limited to looking at the plain language within the "four corners" of the Lease to determine the proper interpretation. *See Luckel v. White*, 819 S.W.2d 459, 461-63 (Tex. 1991).

To determine the meaning of language in the Lease, the Court is guided by well-established rules of interpretation. First, the Court's primary goal is to give effect to the parties' intent as expressed in the writing. *Id.* The applicable standard is the "objective intent" as evidenced by the language used in the Lease, rather than the "subjective intent" of the parties. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981). Additionally, the Court should interpret the Lease as a whole and harmonize all the provisions so that no provision is rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Further, "[n]o single provision

7

taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Id.* Finally, the Court should not construe a contract provision in a manner that is unreasonable or absurd. *See Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987) (stating courts should avoid, when possible, construction that is unreasonable, inequitable, and oppressive); *Pavecon, Inc. v. R-Com, Inc.*, 159 S.W.3d 219, 222 (Tex. App.—Fort Worth 2005, no pet.) (stating that when interpreting a contract, a court should avoid, if possible, construction that is unreasonable, oppressive, inequitable, or absurd).

      **C.**      **Rules Governing Royalty Calculations**

A royalty is "the landowner's share of production, free of expenses." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121-22 (Tex. 1997). While a royalty is free of the costs of production, it is "usually subject to post-production costs, including taxes, treatment costs to render it marketable, and transportation costs." *Id.* This general treatment of royalty payments may be modified by agreement. *Id.*; *see also* Edward B. Poitevent, II, *Post-Production Deductions from Royalty*, 44 S. Tex. L. Rev. 709 (2003). Not all royalty clauses are identical and royalty payments may be based on different formulae; therefore, the particular language used in the contract controls. *Heritage Res.*, 939 S.W.2d at 124 ("Some [royalty clauses] are based on 'proceeds,' some on 'amount realized,' while others are based on 'market value.'").

A frequently used royalty clause in gas leases requires royalty payments to be determined based on "the market value at the well." The Texas Supreme Court has held that this type of royalty clause has a generally understood meaning within the oil and gas industry. *Id.* at 122. While the majority in *Heritage Resources* did not specifically define it, the concurring opinion provided "market value 'at the well' means the value of gas at the well, before it is transported,

treated, compressed or otherwise prepared for market." *Id.* at 129. This definition has been used in the Fifth Circuit in other cases as well. *See Piney Woods Country Life Sch. v. Shell Oil Co.*, 726 F.2d 225, 231 (5th Cir. 1984). When parties specify that royalty payments are calculated based on the market value at the well, they intend to "distinguish between gas sold in the form in which it emerges from the wellhead and gas which thereafter has had value added by transportation and processing." *Heritage Res.*, 939 S.W.2d at 127 (finding persuasive *Piney Woods*, 726 F.2d at 225).

When determining the market value at the well, there are two acceptable methods of calculation. *Heritage Res.*, 939 S.W.2d at 129 (Owen, J., concurring). The first, and most desirable, is to use comparable sales. *Id.* "A comparable sale is one that is comparable in time, quality, quantity, and availability of marketing outlets." *Id.* at 122 (majority opinion). The second acceptable method is used when information on comparable sales is unavailable. *Id.* "This method involves subtracting reasonable post-production marketing costs from the market value at the point of sale." *Id.* This second method is sometimes referred to as the net-back approach. *Id.* at 130 (Owen, J., concurring).

When the royalty payment is based on the market value at the well and there are no comparable sales to establish market value, the net-back approach first finds a point in the downstream sales process where market value for the gas can be established. *Id.* at 122 (majority opinion). After identifying the market value downstream, the net-back approach then requires deductions of reasonable post-production costs from that point back to the well to determine the market value at the well. *Id.* at 123. In this sense, post-production costs are not actually taxed to the royalty owner, they are simply used to determine the value of the gas at the point in time the

9

parties agreed to determine the royalty payments. Scott Lansdown, *The Marketable Condition Rule*, 44 S. Tex. L. Rev. 667 (2003). Therefore, to properly determine what is included and excluded from a royalty calculation when using the net-back approach, it is important to first identify how and where the Lease establishes the point at which the value is determined. *Martin v. Glass*, 571 F. Supp. 1406, 1411 (N.D. Tex. 1983), *aff'd*, 736 F.2d 1524 (5th Cir. 1984). With these rules of interpretation as its guide, the Court turns to reviewing the provisions of the Lease at issue.

### III. ANALYSIS

All of the parties agree that the Lease's royalty provision is unambiguous. Pl. Mot. 1; Def. Brief in Resp. 4. They each argue, however, that their differing constructions are the proper reading. Plaintiffs focus their argument on the express language of the no-deduct clause, which provides that their royalty payments are to be free and clear of all costs and expenses, including compression, treatment, and transportation costs. Pl. Mot. 1. This clause makes clear, Plaintiffs argue, that Defendant's use of post-production costs in calculating their royalty payment violates the terms of the Lease. *Id.*

Defendant, on the other hand, argues that *Heritage Resources* explains that, absent agreement to the contrary, post-production costs may be used to calculate a royalty payment when applying the net-back approach to determine the market value of gas at a point where no comparable sales are available. Def. Brief in Resp. 17. Defendant argues that since the Lease requires royalties to be calculated at the point of sale, and the point of sale to CEMI is factually at the well, then Plaintiffs' royalty payments are proper based on the facts of this case. *Id.*

To resolve this dispute, the Court must first construe "point of sale" as provided in the

10

royalty clause. Contract terms are unambiguous when, based on the plain language, the Court can give them a certain or definite legal meaning or interpretation. *Universal Health Servs., Inc.*, 121 S.W.3d at 746. Defendant contends that "point of sale" means the point where there is a transfer of title in an arm's length transaction in exchange for compensation. Tr. Summ. J. Hr'g, Mar. 1, 2013 at 37-38. The Court agrees. "Point of sale" is not otherwise defined by the Lease terms and therefore has its ordinary meaning, which is the point where the gas is sold in an arm's length transaction. *See Exxon Corp. v. Middleton*, 613 S.W.2d 240, 244-45 (Tex. 1981) (gas is sold when conveyed and delivered to purchaser); *Heritage Res.*, 939 S.W.2d at 121 (terms are given "their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense.").

Plaintiffs argue that "point of sale" must be read together with the no-deduct language to ascertain its meaning, and, when doing so, it means the point where the gas is ultimately sold off of the premises. Tr. Summ. J. Hr'g, Mar. 1, 2013 at 12; *see also* Plaintiff's Letter Brief at 1 ("It is important to note that the use of the phrase "point of sale" in the Lease is not pivotal to Plaintiffs' position."). The Court disagrees and approaches the construction of the royalty clause in this case the same way the Texas Supreme Court approached the issue in *Heritage Resources*. In *Heritage Resources*, the Texas Supreme Court first construed "market value at the well" before turning to how the no-deduct clause interacted with the market value at the well. *Heritage Res.*, 939 S.W.2d at 130 (Owen, J., concurring). After it construed "market value at the well," the Texas Supreme Court then decided "from what are deductions prohibited," according to the no deduct clause. *See id.* ("It is clear certain 'deductions' are prohibited. The question that must be answered is from *what* are deductions prohibited."); *see also Yturria v. Kerr-McGee Oil &*

11

*Gas Onshore, LLC*, 291 F. App'x 626, 632 (5th Cir. 2008) (noting that a court must determine where the value is assessed before addressing the impact of the no-deduct provision). Following the Texas Supreme Court's guidance, the Court's first task in this case is to determine the meaning of "point of sale." As stated above, "point of sale" in the Lease means the place where the gas is sold in an arm's length transaction. Given that construction, the Court must next determine "from what are deductions prohibited," according to the no-deduct clause. *See Heritage Res.*, 939 S.W.2d at 130 (Owen, J., concurring).

The issue of "from what deductions are prohibited" depends on how the no-deduct clause interacts with the market value at the point of sale. The Court begins with the proposition that as a matter of law no deductions from a royalty payment may be made for costs and expenses incurred to discover, drill for, and produce gas at the well. *See id.* at 122-23 (majority opinion). Generally, once gas is produced, reasonable post-production expenses can be deducted when these expenses are incurred following gas production at the well, unless the Lease specifies otherwise. *Id.*

Here, the Lease specifies that the royalty payment is to be calculated at the point of sale. As a result, two approved methods may be used to determine the market value of the gas at the point of sale. *See id.* at 129 (comparable sales or net-back approach). There appear to be no comparable sales made at the point of sale to CEMI that may be used to establish the appropriate market value. Since no comparable sales are available, the net-back method is applicable. This method requires ascertaining the market value of the gas where available downstream and then subtracting reasonable post-production costs from that point to the point where the parties agreed to calculate the market value for royalty purposes—here, the point of sale. *Id.* at 131 (Owen, J.,

concurring).

Plaintiffs present a persuasive argument that the royalty clause should be construed differently. They contend the Texas Supreme Court has held that "market value at the well" has an established meaning in the oil and gas industry. *See id.* at 122 (majority opinion). "Market value at the well" distinguishes "between gas sold in the form in which it emerges from the wellhead *and* gas which thereafter has had value added by transportation and processing." *Id.* at 127 (Owen, J., concurring) (emphasis added). This means that "market value at the well" is "the value of gas at the well, before it is transported, treated, compressed or otherwise prepared for market." *Id.* at 129. Plaintiffs argue that the gas in this case is in this form when it is sold by COI to CEMI.

In addition, Plaintiffs argue that "at the well" means an event that occurs anywhere on the premises described in the lease agreement. *See Exxon Corp.*, 613 S.W.2d at 243. Therefore, since "market value at the well" means gas in its natural state and "at the well" encompasses anywhere on the leased premises, then "market value at the point of sale" must mean gas that has incurred post-production treatment and that has been sold somewhere *other* than within the confines of the lease. Plaintiffs argue this must be the result to ensure that "point of sale" does not become synonymous with "at the well." This construction would result in Plaintiffs' royalty being calculated at the point of sale *off* of the leased premises, ensuring that the royalty payment would be calculated without any reductions for the post-production expenses incurred between the well and the off-the-leased-premises sale. Plaintiff's Letter Brief at 2. As innovative as that argument is, however, to define "point of sale" in this manner would require the Court to construe the Lease in a way that would turn the ordinary meaning of "point of sale," which in this

13

case factually occurs at the well when COI delivers it to CEMI, into a meaning not easily recognizable and far different from its plain meaning.

In addition, in their reply and in their Letter Brief, Plaintiffs appear to argue that Defendant's sale at the well is to an affiliate in an attempt to circumvent the no deduct prohibition. Pl. Reply 5; Plaintiff's Letter Brief at 5. Plaintiff Potts also asserted in a demand letter that Defendant was underpaying him by calculating his royalty based on sales to an affiliated company. Pl. Mot. App. 11-12. If true, evidence that this arrangement was designed to circumvent Defendant's royalty obligation may alter where the true point of sale occurs and how the no-deduct language would apply to the facts of this case. However, Plaintiffs conceded at oral argument that they were not pursuing any such claim. *See* Tr. Summ. J. Hr'g, Mar. 1, 2013 at 8-9.

Finally, in *Heritage Resources* the Texas Supreme Court reversed the reasoning of the intermediate court of appeals because it read the "market value at the well" clause as requiring the royalty calculation to be made at the point of sale. *Heritage Res.*, 939 S.W.2d at 123. In addition, the concurring opinion provided: "[T]here are any number of ways the parties could have provided that the lessee was to bear all costs of marketing the gas. If they had intended that the royalty owners would receive royalty based on the market value at the point of . . . sale, they could have said so." *Heritage Res.*, 939 S.W.2d at 131 (Owen, J., concurring). Plaintiffs argue that they crafted the royalty clause to prevent post-production deductions in accordance with the Texas Supreme Court's guidance on what "point of sale" prohibits. *See* Tr. Summ. J. Hr'g, Mar. 1, 2013 at 3.

As stated above, in *Heritage Resources* the royalty clause provided for royalties to be

paid on the market value at the well *and* provided that there were to be no deductions from the royalty payment for any post-production expenses. *Id.* at 120-21 (majority opinion). Central to the court of appeals' decision was its view that permitting the lessee to deduct post-production costs from the ultimate sale downstream rendered the no-deduct clause meaningless, violating a tenet of contract construction. *Heritage Res., Inc. v. Nationsbank*, 895 S.W.2d 833, 837 (Tex. App.—El Paso, 1995), *rev'd*, 939 S.W.2d 118 (Tex. 1996). However, the Texas Supreme Court reversed and applied the facts of that case to its interpretation of the royalty clause at issue which required the royalty to be calculated at the well, not the point of sale. *See Heritage Res.*, 939 S.W.2d at 122.

While the royalty clause in *Heritage Resources* is very similar to the one in this case, the facts are indisputably different. In *Heritage Resources*, the gas sale took place *off* the premises. *Id.* at 120. Therefore, had the royalty in *Heritage Resources* been calculated at the point of sale, then the no-deduct clause in that case would have prevented post-production deductions incurred from the point of production at the well to the point of the off-the-premises sale when calculating the royalty payment. Here, it is not factually disputed that the sale from COI to CEMI occurs on the premises and at the well. Therefore, in this case the Court's construction of "point of sale" and what the no-deduct clause prohibits is consistent with the Texas Supreme Court's reasoning on when to apply the no-deduct clause. *Id.* at 131 (Owen, J., concurring).

## IV. CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Partial Summary Judgment is denied and

15

Defendant's Motion for Summary Judgement is granted in part and denied in part.[2] This leaves the affirmative defenses asserted by Defendant as the issues that remain pending in this case.

**SO ORDERED** on this **11th day** of **March**, **2013.**

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

[2] At oral argument, the parties agreed that resolving the interpretation of the royalty clause would permit them to propose a path to resolve the remaining issues. Because the Court has construed the royalty clause, the balance of Defendant's motion is denied and the parties shall file a status report providing their suggestions on how the case should move forward in light of this order. *See* Tr. Summ. J. Hr'g, Mar. 1, 2013 at 49-51.